UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHEE A. COLEMAN,<br><br>    Plaintiff,<br><br>    v.<br><br>AMERICAN INTERNATIONAL GROUP, INC. GROUP BENEFIT PLAN, et al.,<br><br>    Defendants. | Case No. 14-cv-01584-VC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT; GRANTING DEFENDANTS' MOTION FOR JUDGMENT**<br><br>Re: Dkt. Nos. 36, 39 |

**Introduction**

Plaintiff Kathee Colman brought this suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging that Defendants American International Group, Inc. Group Benefit Plan (the "Plan"), and Hartford Life and Accident Insurance Company ("Hartford") failed to extend long-term disability benefits in violation 28 U.S.C. § 1132.  The parties filed cross-motions for judgment.  Because the plaintiff has failed to establish that Hartford abused its discretion in denying further long-term disability benefits beyond August 2013 based on its determinations that, (i) the plaintiff had exhausted her benefits for a disability arising from a mental illness, and (ii) she had not shown she was disabled as the result of her physical ailments, the plaintiff's motion is denied.  The defendants' motion is granted in full.

**I. Findings of Fact**[1]

**A. Plan Terms**

The Plan provides long-term disability benefits for a claimant who is disabled because of: (1) "accidental bodily injury"; (2) "sickness"; (3) "Mental Illness"; (4) "Substance Abuse"; or (5) "pregnancy." AR 1511.  For the first 24 months from the date of initial eligibility for benefits, a claimant is disabled within the meaning of the Plan if the claimant is unable to perform one or

---

[1] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

more of the essential duties of his or her occupation. Thereafter, to continue to receive benefits, a claimant must show that he or she is prevented from performing one or more of the essential duties of *any* occupation. *Id.*

For a disability caused by mental illness, the Plan provides a maximum of 24 months of benefits payments in a lifetime.[2] "Mental Illness" is defined as "any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable structural brain damage." AR 1512.

### B. Colman's Disability Claim

In February 2008, Colman left her position as a claims adjuster for American International Group and filed for short-term disability benefits. Colman had previously been diagnosed with a number of illnesses, including fibromyalgia. At the end of the Plan's short-term disability period, she filed a claim for long-term disability benefits. At Hartford's request, she also filed a claim for Social Security disability benefits.

In October 2008, Hartford, the insurer and claims administrator for long-term disability benefits under the Plan, approved Colman's claim. AR 229–232. Hartford determined that Colman's disability had begun on February 1, 2008, and that she was eligible for benefits as of August 1, 2008. (Under the terms of the Plan a claimant is only eligible for long-term disability benefits payments after a 182-day "elimination period.")

In April 2010, Hartford sent Colman a letter notifying her that she was reaching the end of her benefits period for a condition that prevented her from performing the essential duties of her occupation and that, as of August 2010, she would need to show that she was totally disabled—unable to perform the essential duties of any job—to continue receiving long-term disability benefits. AR 195.

In July 2010, after receiving records from Colman's psychologist, Hartford sent Colman a letter stating that information Hartford had received showed that Colman had been disabled "due

---

[2] Specifically, for a disability that is due to "Mental Illness that results from any cause" or "any condition that may result from Mental Illness," benefits payments are capped at "a total of 24 months for all such Disabilities during Your lifetime." AR 1499.

to a Mental Nervous Condition" since June 2009.  Hartford stated that Colman would therefore exhaust her benefits for disability caused by a mental illness in June 2011.  The letter also informed Colman that it was "awaiting the medical information requested from your physicians . . . to continue to evaluate your physical function.  This information is needed in order to determine if you meet the policy definition of Disability and continue to qualify for benefits on and after 08/01/2010, due to a physical condition."  AR 184.

In April 2011, Colman was examined by Dr. Ekaterina Malinovsky.  Dr. Malinovsky reported to Hartford that, due to a combination of Colman's chronic pain, depression, and the side effects from her pain medication, Colman would continue to be completely disabled through April 2012.

In August 2011, Hartford requested that Colman undergo an independent medical examination.  Dr. Aubrey Swartz conducted the examination.  In his report, Dr. Swartz opined that Colman's physical ailments were not so severe as to render her totally disabled.  Based on the activity restrictions in Dr. Swartz report, Hartford determined that Colman would be able to perform the essential duties of a number of occupations, including her own former occupation as a claims adjuster.

In October 2011, Hartford notified Colman that she no longer fell within the Plan's definition of disabled, and would therefore receive no further benefits beyond October 31, 2011.  The letter informed Colman that she had exhausted her benefits for disability arising from mental illness, and that Dr. Swartz's examination showed that her physical disabilities were not so severe as to preclude her from working in any occupation.  AR 162–64.

Colman appealed this determination, providing hundreds of pages of additional documents.  In her appeal, Colman also questioned Hartford's claim procedures and Swartz's impartiality.  As part of its review of Colman's appeal, Hartford sent Colman's file to University Disability Consortium for independent review.  Two doctors, an orthopedist and a pain management specialist, reviewed Colman's file.  The orthopedic specialist opined that Colman did not have any orthopedic problems that would cause her to be completely disabled.  The pain management specialist opined that neither Colman's pain nor any side effects from her pain medication would prevent her from performing sedentary work, so long as she was able to take regular rest periods.

3

In November 2012, Hartford sent Colman a letter notifying her that, after reviewing her appeal, it was reversing its earlier determination that Colman was no longer disabled. Hartford acknowledged that its decision to invoke the mental illness limitation as of June 2009 had been "premature," because "it was not clearly established that [Colman's] physical complaints were not impairing at that time." AR 151. Hartford informed Colman that it was retroactively reinstating Colman's benefits payments, effective August 2011. It stood by its prior determination that, as of August 1, 2011, Colman's physical ailments did not prevent her from working in any job, but acknowledged that Colman's "behavioral health complaints continue[d] to prevent her from returning to gainful employment." Hartford stated that it would restart the 24-month mental illness benefits period as of that date, and would therefore pay benefits based on Colman's disabling mental illness until August 2013. Finally, the letter informed Colman that nothing about this determination would preclude her from submitting additional evidence that her physical ailments were disabling, and that if Hartford received such information, it would remove the 24-month limitation on her benefits. *Id.* at 151–52.

Colman did not submit any further medical evidence. In August 2013, Hartford terminated Colman's mental illness benefits. This lawsuit followed.

### C. Medical Evidence[3]

**June 2008:** Dr. Rapp, Colman's primary care physician at Kaiser Permanente, submitted an "Attending Physician Statement" in support of Colman's long-term disability claim. In that report, Dr. Rapp listed Colman's primary diagnosis as "adjustment [disorder] w/ depression," and her secondary diagnosis as "chronic pain, myalgia, myositis." AR 988. Dr. Rapp opined that Colman would be totally disabled until July 30, 2008. She provided no information about any partial disability. A few weeks later, Dr. Rapp confirmed to Hartford by fax that she was releasing Colman to return to work full time without restriction or limitation at the end of July. AR 1315.

**July 2008:** Notes from Psychologist Janice Alley's ongoing treatment for Colman's "bereavement, uncomplicated" and "depression, major, recurrent," AR 1412 (capitalization omitted), stated that Colman was "Sad, tearful around grief." AR 1413. Alley also noted that

---

[3] This chronology is only an overview of Colman's medical records, which span hundreds of pages of the administrative record.

4

Colman had reported a "flare-up" of her fibromyalgia, but provided no further details of Colman's physical symptoms. AR 1413.

Notes from a late-July visit with Dr. Carlo Esteves—a pain specialist who had been treating the pain from Colman's fibromyalgia and degenerative joint disease since February 2008, *see* AR 1971–74—reported that Colman's "generalized body pain . . . is being managed with medication, acupuncture, [physical therapy] and injections. Patient . . . reported to be doing well." AR 2110.

Dr. Rapp referred Colman to Dr. Anatoliy Fortenko, a specialist at Kaiser, "for evaluation of neck and arm pain." AR 1351.

**August 2008:** Dr. Fortenko completed a Physical Capabilities Evaluation Form in which he opined that, "[i]n a general workplace environment," Colman was able to sit for four hours per day, stand for one hour, and walk for one hour. He opined that Colman was "[f]requently" able to perform many tasks, including carry up to 20 pounds, drive, climb, balance, kneel, crouch, stoop, crawl, and reach above shoulder height. AR 979. He found that these restrictions were temporary, and should be reassessed in December 2009. AR 980. Dr. Fortenko's treatment notes state that Colman's MRI scan showed "'[w]ear and tear' changes in [her] cervical discs causing narrowing of the nerve channels and irritations [sic] of nerves." AR 1353. Dr. Fortenko noted that Colman suffered from diffuse neck and shoulder pain, and constant numbness in both hands. AR 1346. He diagnosed cervical disc degeneration and chronic pain, AR 1344, and referred Colman to Dr. Andrew Nguyen for nerve conduction studies. AR 1340.

**September 2008:** Dr. Nguyen noted that, apart from numbness in both hands, Colman had "good pain control" and was "[t]olerating medications well." AR 1344. On September 4, 2008, based on the results of the nerve conduction studies, Dr. Nguyen diagnosed carpal tunnel syndrome. AR 1340.

**June 2009:** Psychologist Katherine Walker began treating Colman for depression. *See* AR 970. At a follow-up visit in July, Colman reported "depressed mood, insomnia, decreased energy, significant appetite change, low self esteem, decreased concentration, psychomotor retardation and suicidal ideation," as well as "life problems including relationship problems and conflict in family." AR 1242.

5

**January 2010:** Walker referred Colman to an intensive psychiatric outpatient program to address her worsening depression. AR 1257. At the end of January, Colman reported that she was "doing a lot better." AR 1272. She graduated from the intensive outpatient program with instructions to follow up with Walker. *Id.*

**April 2010:** Dr. Esteves noted that "Patient tolerates her meds with no side effects and reported benefits in the management of her fibromyalgia. Her main concern now is her low back pain that has been going on intermittently for the past 2 years." AR 871. Dr. Esteves referred Colman to a physical therapist, Joanne Voerge. AR 875. Voerge noted that Colman was able to drive herself and was responsible for her own activities of daily living. But Voerge also noted that Colman reported difficulty walking even short distances. AR 876. Voerge and Colman agreed to long-term goals for Colman's treatment, including the ability to sit for 30 minutes and stand for 30 minutes "each hour during a usual and customary work day." AR 875. This treatment plan spanned 24 weeks—one visit every 4 weeks for "up to 6 weeks". AR 876.

**May 2010:** Walker provided to Hartford an Attending Physician's Statement where she noted Colman's depression, and opined that Colman's symptoms were "of such severity that would preclude the patient from social/occupational functioning." AR 970. Walker stated that these symptoms had been severe enough to preclude Colman from working at least since Walker began treating Colman in June 2009. Walker declined to provide a target date for Colman's return to work, instead stating that this was "to be determined by her MD." AR 972.

**June 2010:** On a referral from Dr. Esteves, Dr. Darko Vodopich performed an injection to treat Colman's "left sacroiliac joint pain." AR 932. Colman denied any "numbness . . . weakness, tingling." She described her symptoms as: "sharp, throbbing." Her symptoms were "intermittent," "of less than a year duration," and "ha[d] not changed in quality since they began." *Id.* Her pain was aggravated by "walking and bending," and alleviated by "sitting and lying down." *Id.* Though Colman reported a pain level of "7/10," she also reported that her symptoms only "slightly" interfered with her usual activities. *Id.* After the procedure, Colman reported that her pain was reduced to "1-2/10." AR 934.

**August 2010:** Dr. Esteves noted that Colman continued to complain of neck and muscle pain, but that she "remained stable with her medications and no side effects." AR 889

**October 2010:** Dr. Vodopich gave Colman a cervical epidural steroid injection to alleviate her neck pain. Dr. Vodopich's report noted, "Patient denies numbness, denies weakness, tingling . . . Symptom description: sharp. Symptoms are constant and of 1-2 years duration, interfere with patient's usual activities moderately." He noted "fibromyalgia" as an "[o]ther area of chronic pain." AR 927.

**December 2010:** Dr. Vodopich performed another sacroiliac joint injection to treat Colman's complaint of "buttock pain." Colman reported that the previous injection in June had provided "adequate pain relief for almost 6 months." At this visit, Dr. Vodopich noted that Colman did not complain of any other areas of chronic pain, and that her pain was relieved by sitting and lying down. AR 902. After the injection, Colman reported that her pain was 0/10.

Dr. Esteves submitted to Hartford an Attending Physician Statement, in which he offered no opinion about Colman's ability (or lack thereof) to work. Like Walker, Dr. Esteves stated that Colman's return-to-work date "needs to be determined by patient physician." AR 942.

**April 2011**: Dr. Ekaterina Malinovsky completed an Attending Physician's Statement, in which she remarked:

> Pt is new to me. She has been out of work since 2008 due to her chronic pain. She developed chronic pain in 2006 after a fall. She complains of diffuse arthralgia and myalgia since Oct 2011. She had nerve blocks in the past which worked for her. She also complains of [bilateral] tingling in 1-3 fingers. She had [a nerve conduction study] in 2008 which showed mild [carpal tunnel syndrome]. Right shoulder pain for about 6 mos, aggravated with movements. Followed by chronic pain department. Combination of pain, depression and side effects of pain meds make her unable to work.

AR 866. Dr. Malinovsky concluded that Colman would be completely disabled for one year, until April 2012.

**June 2011:** Dr. Steven Johnson treated Colman for her complaint of right shoulder pain. Dr. Johnson performed an injection into Colman's shoulder joint, after which she reported immediate relief. AR 2378.

**August 2011:** Hartford referred Colman to Medical Consultants Network for an independent medical examination. Medical Consultants Network arranged for Dr. Swartz, an orthopedic specialist, to conduct this examination. Dr. Swartz described Colman's symptoms as follows:

> The primary pain she has is in her neck. It radiates into the left upper extremity into her arm, and also into the right shoulder, plus headaches. She has no numbness, occasional tingling. She also has pain in her low back. Her pain is worsening. It is in the sacroiliac joints and into the knee on the left side, and on the right side, it is in her right hip. She has no numbness. She has pain in her hips with walking. She has pain in both shoulders and knees, and she has the pain in her hips.

AR 807. Dr. Swartz noted that, in the "physical capacities checklist" Colman had completed during her visit, she stated she was only capable of dressing herself, preparing meals, and making the beds. Based on his in-person examination and his review of Colman's medical records from the prior three years, Dr. Swartz opined:

> From an orthopedic or musculoskeletal viewpoint only, I would find that there is no evidence to support such extreme restrictions, and there is indication that she is capable of substantially greater function that that which she presented in my office. *Setting aside the chronic major depression, which is often considered a substantial impediment to reasonable functional activity*, I find that she is capable, on the basis of my musculoskeletal examination, of considerably greater functional capacity.

AR 812 (emphasis added). Dr. Swartz went on to describe the functional capacity he believed was justified based on his orthopedic examination. Based on these restrictions, Hartford determined that Colman had the ability to work in a number of jobs, including her previous position as a claims adjuster. AR 753.

**September 2011:** Dr. Glenn Vives, who had been treating Colman in a medical weight management program since April 2011, AR 2349, noted that Colman had recently gone on a Mediterranean tour, and "did a lot of walking." AR 2423. Dr. Vives also noted that despite Colman's diagnosis of chronic pain, she had no pain-related concerns or complaints during that visit. AR 2424.

Dr. Vodopich gave Colman another cervical epidural injection. Dr. Vodopich noted that Colman reported that her overall pain was "better," an average of "1–4/10" prior to the injection. AR 2429.

**October 2011:** Colman completed her Chronic Pain Management program. She was referred back to her primary care physician for ongoing treatment of her chronic pain. Dr. Esteves noted that Colman "continues to tolerate and benefit from her medications with no side effects" and that she "remained stable and functional." AR 2440.

**April 2012:** Dr. Vodopich repeated the cervical epidural injection. He again noted that Colman's pain was "better," "1–2/10" at the time of the visit and averaging "1–4/10." AR 2459. A few weeks later, Dr. Vodopich repeated the sacroiliac joint injection. At this visit, Colman again reported that the past injection had "helped tremendously," providing "adequate pain relief" for almost six months, but that her pain had recently been worsening. Dr. Vodopich noted that her pain had been "8/10" before the procedure, but returned to "0/10 post-procedure." AR 2464.

**October 2012:** Hartford sent Colman's file to University Disability Consortium for a medical file review. As part of this review, two physicians, Orthopedist James Boscardin and Pain Medicine Specialist Devin Peck, reviewed Colman's medical records. The report from Dr. Boscardin's review focused largely on the report from Dr. Swartz's independent medical exam. Dr. Boscardin largely agreed with Dr. Swartz's conclusions. He opined that "my review would not support an inability to do minimally, a sedentary level of function." AR 299. However, he noted that he made "no judgments relative to [Colman's] psychiatric factors and how they may or may not be impacting her overall function." AR 297. Dr. Boscardin also noted that he had made several attempts to contact Dr. Malinovsky to discuss Colman's condition, but never received any response from Dr. Malinovsky.

Dr. Peck's report provided a detailed description of the medical records from Colman's various doctors. He noted that "[t]hroughout the documentation there were consistent reports of pain and frequent reports of poor coping." AR 311. Dr. Peck opined, "From a purely muscolosketetal standpoint, the claimant is able to perform the tasks required for light work. She has other factors which may further limit her to sedentary work, including pain, medication side

effects, and the psychiatric sequelae of her pain (which lie beyond my field of expertise)." AR 311. Dr. Peck found that "with regard to pain as a factor limiting work ability, the claimant is capable of sedentary work with the associated R[estrictions] and L[imitation]s as defined in the [Department of Labor's Dictionary of Occupational Titles] as of 8/1/11 through the present," but he also noted that Colman "should be allowed fifteen minutes of rest every two hours due to pain." *Id.* Dr. Peck opined that these rest periods would also "be adequate to accommodate [Colman's] complaints of medication side effects." AR 312.

### D.  Social Security Disability Claim

In 2009, at Hartford's request, *see* AR 217, Colman filed a claim for Social Security disability benefits. The Social Security Administration requested that an orthopedic doctor, Dr. Calvin Pon, and a psychiatrist, Dr. Stefan Lampe, examine Colman in connection with her claim. The physicians offered separate opinions about Colman's impairment. Neither doctor found limitations that would prevent Colman from performing sedentary work. *See* AR 2697–99, 2708–09. The Administration denied benefits. AR 1089–93. When Colman appealed this denial, the Administration requested additional evaluations by two psychologists. The first of these, Sokely Khoi, examined Colman in a December 2009. Based on this examination, Khoi opined that Colman suffered "[m]oderate to [m]arked" impairment in her ability "to withstand the stress of a routine work day," and "[m]oderate" impairment in her ability "to interact appropriately with co-workers, supervisors, and the public on a regular basis." Khoi offered no opinion about Colman's physical condition. The second psychologist, Preston Davis, reviewed Colman's case in January 2010. Based on his review, Davis opined that Colman's psychiatric condition was "severe" but that she could "sustain her concentration, pace, & her persistence w/her wk tasks for 2 hr blocks of time, w/customary breaks, over the course of a regular wkday/wk." Davis further opined that Colman could "interact w/supervisors & w/cowkers she knows well," but that she "has mood & personality problems," and "would have difficulty coping w/the stress of having to consistently interact w/the general public. She can perform her wk tasks w/little general public contact." AR 2826.

The Social Security Administration's internal case analysis subsequent to these evaluations stated that the Administration had determined that Colman was disabled as of May 2009 "with increasing psy[chiatric] conditions and [diagnosis] as given above [in Davis's review]." The Administration notified Colman by letter that it had determined she was disabled as of May 2009. The letter did not specify the basis for the Administration's determination. AR 2614.

### III. Conclusions of Law

### A. Standard of Review

The standard by which a court reviews an administrator's denial of ERISA benefits depends on the terms of the benefit plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). Here, the Plan unambiguously grants discretion to Hartford.[4] As a result, Hartford's decision is reviewed for abuse of discretion. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc). However, Hartford's role as both insurer and claims administrator creates a conflict of interest that the Court must weigh as a factor in its review. *See id*. at 965–66. The presence of a conflict does not convert abuse of discretion review into de novo review, but it does mean that a reviewing court must consider "the conflict of interest in deciding how skeptical to be of the administrator's decision." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011). The weight a reviewing court accords to a conflict varies "based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009). Under abuse of discretion review, the Court must consider whether the decision was "(1) illogical (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676. Ultimately, upon consideration of all the relevant circumstances, "the administrator's decision cannot be disturbed if it is reasonable." *Id.* at 675.

---

[4] Although in her opening brief Colman questions whether the Plan contains a grant of discretion to Hartford, the defendants' brief identified language in a Plan document granting to Hartford "full discretion" both over determinations of eligibility for benefits and "to construe and interpret all terms and provisions of the Policy." AR 1524. In her reply brief, Colman offers no argument that this language is insufficient to trigger abuse of discretion review, and instead appears to concede this point.

11

### B. Evidence of Bias

Colman argues that the affidavit of a former Hartford long-term disability claims adjuster, Sandra Carter, a history of "poor and biased claim performance" on the part of Hartford. Pltf's MSJ at 19. But this affidavit is of little value in establishing the effect of Hartford's structural conflict of interest on its determination of Colman's eligibility for benefits. Carter worked in the disability claims department in Hartford's Georgia office for two years between 2004 and 2006. Her affidavit describes her experiences in that office during that time. AR 1891–92. Colman's claim was filed two years after Carter left the claims department. And there is no evidence in the record that anyone from Hartford's Georgia office had any involvement in Colman's claim.

Colman argues that Hartford's "failure to present extrinsic evidence of any effort on its part to assure accurate claims assessment[,]" *Montour*, 588 F.3d at 634 (internal quotation marks omitted), tends to show that Hartford's conflict affected its benefits decision. But while a conflict may "prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy," *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008), an administrator is not obligated to provide this type of evidence. *Montour*, 588 F.3d at 634.

Colman further argues that Hartford's use of Dr. Swartz as an independent medical examiner, and its subsequent inclusion of Dr. Swartz's report in the files it sent to Drs. Boscardin and Peck, serve as additional evidence that Hartford is biased against approving claims. In *Hangarter v. Provident Life & Accident Insurance Co.*, 373 F.3d 998, 1011 (9th Cir. 2004), the Ninth Circuit affirmed a district court's determination that Provident's repeated use of Dr. Swartz supported a jury's determination that Provident "engaged in a biased, and thus 'bad faith,' investigation" of a claim. But nothing in *Hangarter* suggests that Dr. Swartz is necessarily biased in *every* independent medical review. Rather, the jury had been presented with evidence that an insurer's continual use of the same independent examiner could lead to the examiner becoming biased in favor of *that particular insurer*. *See id.* Colman points to no evidence about the frequency with which Hartford used Dr. Swartz or the other reviewers it employed in the case. *See Montour*, 588 F.3d at 634 (noting that "Montour . . . did not submit any extrinsic evidence of bias,

12

such as statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed in this case."). And Colman's suggestion that Hartford somehow acted improperly by including Dr. Swartz's report when it sent Colman's file for review is without merit. Colman points to a statement in the referrals sent to Drs. Boscardin and Peck, that "to maintain objectivity, any prior medical consultant reviews are not enclosed," AR 290 (capitalization omitted), and argues that Hartford ignored its own statement by including Dr. Swartz's report in the files it sent for review. But contrary to Colman's argument, Dr. Swartz's report was not a "prior medical consultant review[ ]" of Colman's claims file, but rather the findings of his in-person independent medical examination of Colman.

Without significant extrinsic evidence of either the effects of Hartford's conflict, such as "any evidence of malice, of self-dealing, or of a parsimonious claims-granting history," *Abatie*, 458 F.3d at 968, or its affirmative efforts to reduce bias, the Court finds that Hartford's structural conflict of interest warrants only a moderate level of skepticism.

### C. Procedural Claims

Colman claims that a number of procedural errors in Hartford's claims determination prevented her from receiving a "full and fair review" of her claim. *See* 29 U.S.C. § 1133. "A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972. "When an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* (internal quotation marks omitted). But "[a] more serious procedural irregularity may weigh more heavily," *id.*, to the point where an administrator's use of a flawed claims procedure may itself constitute an abuse of discretion. *See Glenn*, 554 U.S. at 115.

Colman argues that Hartford abused its discretion by failing to notify her of what she needed to provide to perfect her claim. To be sure, the October 2011 letter in which Hartford informed Colman that she had not established that qualified as disabled due to a physical condition was "hardly a model of clarity," *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d

863, 870 (9th Cir. 2008). The letter cataloged some of the evidence in Colman's file, but provided little in the way of explanation for why the information was insufficient to establish disability due to a physical condition. *See id.* However, any deficiency in the letter was mitigated by the fact that, from July 2010 onward, Hartford had repeatedly notified Colman that she needed to provide Hartford with evidence that her physical ailments prevented her from working in any occupation. *See* AR 86, 178–84.

Moreover, to the extent that Colman now argues that Hartford's communication with her was not sufficiently clear for her to understand the need to provide evidence of her physical condition, this argument is contradicted by Colman's response to Hartford's October 2011 denial letter, which showed that Colman understood the need to show that she was physically disabled. In her appeal, Colman argued that her depression was "significantly secondary" to her physical ailments. And in support of her appeal, she submitted hundreds of pages of additional documents in an attempt to establish physical disability. Although these documents did not include any new reports from Colman's doctors that would support a claim of disability due to a physical condition, she provided a number of articles discussing the symptoms of chronic pain—her chief physical complaint.

What's more, Hartford's November 2012 response to Colman's appeal provided a much more detailed explanation of its decision. This letter informed Colman that although Hartford had determined that she had not established a physical cause of her disability as of August 2011, she would continue to receive disability benefits based on her mental illness through July 2013. The letter also stated that she was free to submit additional evidence of her physical condition. Thus, in contrast to *Saffon*, where the information in Metlife's final denial letter "came too late to do Saffon any good," 522 F.3d at 871, here Colman had the opportunity to submit additional evidence in response to the explanations in Hartford's November 2012 letter.

Colman further argues that Hartford made no mention of the Social Security Administration's determination of disability in any of its communications with Colman about her claim under the Plan. In *Montour*, the Ninth Circuit observed:

14

> While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process. In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence.

588 F.3d at 635 (citations and internal quotation marks omitted).

Hartford would have been well-served to acknowledge the Social Security Administration's disability determination in its denial letter, and to explain why Hartford believed that determination was not contrary to its own benefits decision. *See id.* at 637. But unlike in *Montour*, here it appears that there is little if any inconsistency between Hartford's determination and that of the Administration. While Hartford did not address the Administration's decision in its own benefits determination, Hartford did acknowledge that Colman's mental illness prevented her from working in any position. AR 151. *See also* AR 160–63 (explaining that Hartford had been paying disability benefits based on Colman's mental illness, but that Colman had exhausted those benefits). Though it is not apparent from the Social Security Administration's letter granting benefits, the records from the Administration's evaluation of Colman's claim make clear that this is what the Administration determined as well. *See supra* Section I.D. Therefore, the Court accords only limited weight to Hartford's failure to mention the decision. *See Sethi v. Seagate U.S. LLC Grp. Disability Income Plan*, No. 12-17215, 2014 WL 7272969, at *1 (9th Cir. Dec. 23, 2014) ("Liberty did not abuse its discretion by denying benefits without addressing decisions made in her workers' compensation case. Because Sethi has not shown a conflict between Liberty's decision and the workers' compensation decisions, no further explanation was required.").

Nothing in the record suggests that Hartford purposely withheld information or was otherwise attempting to "hide the ball" from Colman in a way that would render its decision a procedural abuse of discretion. *Cf. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011) (holding that the administrator's decision was procedurally arbitrary and capricious where the administrator denied the claim "largely on account of absence of objective medical evidence, [while failing] to tell Salomaa what medical evidence it wanted."). To the contrary, it appears that, prior to its benefits denial, Hartford attempted to fulfill the requirement of a "'meaningful dialogue' between claims administrator and beneficiary," *Saffon*, 522 F.3d at 870.

15

(quoting *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). Hartford's benefits determination was not perfect. But Hartford's course of dealing with Colman and her doctors was not certainly unreasonable, meaning that it does not rise to the level of a procedural abuse of discretion. Indeed, viewed as a whole, Hartford's actions display a level of care that is lacking in many ERISA cases. However, the Court nonetheless further tempers the discretion afforded Hartford's decision to account for the relatively minor procedural irregularities in its handling of Colman's claim.

### D. Benefits Decision

Turning to the substance of Hartford's decision, in its November 2012 letter responding to Colman's appeal, Hartford determined that Colman had failed to establish that a physical ailment, as opposed to mental illness, rendered her unable to perform any job as of August 2011 (or any time thereafter). Hartford therefore invoked the Plan's 24-month mental illness limitation as of as of August 2011. Though Hartford never expressly stated as much, it is implicit in Hartford's communications with Colman that Hartford interprets the Mental Illness limitation to apply where a claimant is unable to work in any occupation as the result of a combination of mental illness and physical ailments (so long as the physical ailments are not of such severity that these ailments taken alone would render the claimant unable to work). In other words, Hartford interprets the limitation to apply where mental illness is a but-for cause of the disability, irrespective of whether physical factors also contribute to the claimant's inability to work.

Colman argues that the Plan's mental illness limitation is ambiguous, and that any ambiguity must be construed in favor of coverage under the principle of *contra proferentem.* Colman is correct that *Contra proferentem* generally applies in interpreting ambiguous terms in an ERISA-covered plan. But the applicability of the principle in the ERISA context is subject to a number of exceptions, including where "the plan grants the administrator discretion to construe its terms." *Blankenship v. Liberty Life Assur. Co. of Bos.*, 486 F.3d 620, 625 (9th Cir. 2007). Where the plan grants discretion to the administrator, it is the administrator who resolves ambiguities in the plan's language. The only question for a reviewing court is whether the administrator's interpretation is reasonable. *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1098 (9th Cir.

2012). Here, even if the language of the mental illness limitation were ambiguous about whether a disability caused in part by a physical ailment and in part by a psychological, behavioral, or emotional ailment falls within the limitation, Hartford's interpretation of the limitation is a reasonable one. *See Maurer v. Reliance Standard Life Ins. Co.*, No. C 08-04109 MMC, 2011 WL 1225702, at *7 (N.D. Cal. Mar. 31, 2011), *aff'd*, 500 F. App'x 626 (9th Cir. 2012).

Given this interpretation, Hartford reasonably invoked the 24-month mental illness limitation, beginning August 2011, when, in November 2012, Hartford retroactively reinstated Colman's benefits payments. To be sure, Colman's medical records list a host of diagnoses, many of them for physical ailments, going back to 2005. *See, e.g.*, AR 901. But a diagnosis of a physical ailment is not alone sufficient to establish disability resulting from that ailment. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled in part on other grounds by Abatie*, 458 F.3d at 969.

Moreover, in determining that Colman's physical ailments did not render her unable to work in any occupation, Hartford did not dispute that those physical ailments cause her pain. Indeed, given her diagnoses of chronic pain and fibromyalgia, it would have been improper for Hartford to deny Colman's claim based on a lack of objective evidence of pain. *See Montour*, 588 F.3d at 635; *see also Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004). But unlike in *Montour*, where the doctor treating Montour's condition "consistently maintained to Hartford that Montour remained physically disabled and unable to work in any job" and listed specific restrictions on Montour's physical activities, 588 F.3d. at 627, 635, Colman is unable to point to a single medical opinion stating that any of the physical ailments listed in her records (as opposed to her depression or a combination of her physical ailments and her depression) prevented her from working as of August 2011.

Indeed, the record shows that the only doctor to opine that Colman remained completely unable to work as August 2011 was Dr. Malinovsky. In her April 2011 Attending Physician Statement, Dr. Malinovsky opined that Colman would be completely disabled through April 2012. But Dr. Malinovsky found that Colman was disabled due to a combination of chronic pain, depression, and side effects from pain medication. The report did not explain whether one of these causes predominated over others. Nor did it provide any detail as to Colman's functional

limitations. And when Dr. Peck contacted Dr. Malinovsky in October 2012, Dr. Malinovsky was unable to elaborate on her report, explaining that she had only seen Colman only once. AR 301. Consequently, it was not unreasonable for Hartford to determine that Colman had not established that she was disabled due to physical ailments as of August 2011. *See Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1041 (N.D. Cal. 2011), *aff'd in relevant part*, 563 F. App'x 530 (9th Cir. 2014).

## Conclusion

Considering all the relevant circumstances, Hartford's determination that Colman had not established that her physical condition prevented her from working in "any occupation" as of August 2011 was neither procedurally nor substantively unreasonable. Hartford therefore did not abuse its discretion. Accordingly, the Court denies Colman's motion for judgment and grants Hartford's motion for judgment.

**IT IS SO ORDERED.**

Dated: April 9, 2015

_____
VINCE CHHABRIA
United States District Judge